## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-00507-NRN

KELLY LANHAM, Derivatively on Behalf of LIGHTING EMOTORS, INC.,

      Plaintiff,

v.

DR. AVI S. KATZ,
DR. RALUCA DINU,
NEIL MIOTTO,
BRAD WEIGHTMAN,
JOHN J. MIKULSKY,
ANDREA BETTI-BERUTTO,
PETER WANG,
ROBERT FENWICK-SMITH,
BRUCE COVENTRY,
KENNETH JACK,
WANDA JACKSON-DAVIS,
TIM REESER,
THADDEUS SENKO,
DIANA TREMBLAY, AND
TERESA P. COVINGTON

      Defendants,

And

LIGHTNING EMOTORS, INC.,

      Nominal Defendant.

_____

## CORRECTED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
_____

      Plaintiff Kelly Lanham ("Plaintiff"), by and through her undersigned attorneys, brings

this derivative complaint for the benefit of nominal defendant Lightning eMotors, Inc.

("Lightning eMotors" or the "Company"), against its Board of Directors (the "Board") and

certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon*, inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of publicly available documents, including the allegations of the consolidated complaint filed in the securities class action captioned *Shafer v. Lightning eMotors Inc.*, Case No. 1:21-cv-02774 (D. Colo.) (the "Securities Action"), conference call transcripts and announcements made by Individual Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Lightning eMotors, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Lightning eMotors against certain officers and members of the Company's Board for breaches of their fiduciary duties and violation of the federal securities laws by causing the issuance of materially false and misleading statements in the Company's March 26, 2021 proxy statement (the "Proxy") and in other public statements that have exposed the Company to massive class-wide liability, as well as the expenditure substantial defense costs in connection with the Securities Action.

2.      The Company's predecessor, GigCapital3, Inc. ("GigCapital3"), was a special-purpose acquisition company ("SPAC") formed by GigAcquisition3, LLC at the direction of GigCapital Global and GigFounders LLC, and through such entities, managing partners Defendants Dr. Avi S. Katz ("Katz") and Dr. Raluca Dinu ("Dinu"), to pool funds through an initial public offering ("IPO") to acquire or otherwise combine with a late-stage private company.

On May 18, 2020, GigCapital3 conducted an initial public offering (the "IPO").

3.      In the registration statement and prospectus filed with the SEC in connection with its IPO, GigCapital3 differentiated itself from other SPACs by highlighting its "Mentor-Investor" philosophy "to partner with our targets where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company." Touting its management team's "best practices and key learnings," GigCapital3's registration statement and prospectus stated that the management team's "deep relationships" in the technology sector and "know-how present a significant opportunity to help drive strategic dialogue, access new customer relationships and achieve global ambitions following the completion of our initial business combination."

4.      Prior to GigCapital3's IPO, SPAC sponsor GigAcquisitions3 (owned by the GigCapital3 management team) purchased more than 5.7 million "founders' shares" of GigCapital3 (approximately 20% of the SPAC) for just $25,000. Thereafter, GigCapital3 successfully raised $200 million through the sale of securities to investors in its IPO.

5.      On December 10, 2020, GigCapital3 announced that it had reached an agreement to acquire an electric vehicle and powertrain manufacturer based in Loveland, Colorado, Lightning Systems (then doing business as Lightning eMotors). Lightning Systems designed, engineered, customized, and manufactured complete zero-emission-vehicle ("ZEV") solutions for commercial fleets, including Class 3 cargo and passenger vans, ambulances, Class 4 and 5 cargo vans and shuttle buses, Class 4 Type A school buses, Class 6 work trucks, Class 7 city buses, and motor coaches. Lightning Systems provided fleet customers with a full suite of control software, telematics, analytics, and charging solutions to simplify the buying and ownership experience and maximize uptime and energy efficiency.

6.    Under the agreement, if approved, Lightning Systems would become a wholly-owned subsidiary of GigCapital3, which would rename itself Lightning eMotors. GigCapital3 units, warrants, and common stock, which traded on the New York Stock Exchange ("NYSE") under the symbols "GIK.U," "GIK.WS," and "GIK," would be relisted as "ZEV.WS" and "ZEV," with the units ("GIK.U") first being broken into their underlying securities.

7.    Lightning Systems was portrayed as not only a good candidate for the "Mentor-Investor" approach, but as a company poised for massive growth. Based on a backlog of contracted orders into 2022, it was claimed that the funding provided through the combination with GigCapital3 would purportedly allow Lightning Systems to scale up production and increase its revenues 600% on a year-to-year basis, from $9 million in 2020 to $63 million in 2021, and increase revenues 460% on a year-to-year basis in 2022, to $354 million. It was also forecast that the Company's gross margin would increase from 3% in 2020 to 19% in 2022.

8.    On March 26, 2021, GigCapital3 issued and disseminated the Proxy, soliciting shareholders to vote to approve the merger with Lightning Systems (the "Merger"). In accordance with the Company's Mentor-Investor philosophy, Defendants Katz, Dinu, and Neil Miotto ("Miotto") were to be appointed to the new company's Board for initial terms of three, two, and one years, respectively, following the completion of the Merger.

9.    The Individual Defendants knew, or recklessly disregarded, however, that Lightning Systems could neither rapidly scale its operations as stated, nor achieve the projected revenue forecasts. Because of its limited two-year operating history, the Company lacked a supply chain adequate to support the forecast production increase. Prior to the Merger, Lightning Systems utilized small, secondary suppliers for key parts, including vehicle batteries. Those suppliers

lacked the capacity to supply the Company with components in quantities necessary to meet vehicle production and, consequently, revenue targets.

10.     The Merger closed on May 6, 2021, and on May 7, 2021, the Company's securities began trading on the NYSE.  Lightning eMotors obtained approximately $268 million in gross proceeds from the Merger. In addition, Defendants Timothy Reeser and Robert Fenwick-Smith, who had owned significant Lightning Systems equity, owned millions of shares of a publicly-traded company with the possibility of earning additional shares pursuant to an "earnout" clause in the Merger agreement. In addition, Defendant Reeser received a six-figure "bonus" upon the closing of the Merger, and Defendants Fenwick-Smith and Teresa Covington, the Company's former Senior Vice President and Chief Financial Officer ("CFO"),  each received a significant five-figure "bonus" within a few weeks of closing. Reeser's annual salary more than doubled and he was awarded large grants of Lightning eMotors restricted stock. GigAcquisitions3's founder shares, which were purchased for $25,000, have made the GigCapital3 management team millions in profits.

11.     Five days after the close of the Merger, on May 11, 2021, the new Lightning eMotors Board met and reclassified the directorships of Katz (now co-Chairman of the Board) and Dinu, so that they would only serve initial terms of one year on the Company's Board, retreating from their publicly touted "Mentor-Investor" approach.

12.     On May 17, 2021 – eleven days after the Merger closed – Lightning eMotors announced that for the first quarter of 2021, the Company produced only 31 vehicles and one powertrain kit of a projected 500 in its annual quota, experiencing a net loss for the quarter of $27.4 million.  It also revised its financial guidance to $50 to $60 million in revenue for 2021, down from the $63 million reported in the Proxy. The Company attributed the shortfalls to supply

chain issues in the first quarter, and it warned that supply chain shortages would "have a significant impact on short-term margin and operating costs." Nonetheless, the Individual Defendants stated that "Lightning eMotors [was] well-positioned to achieve its 2021 forecast of over 500 purpose-built zero emission commercial vehicles," and well-equipped to handle any further "supply chain unpredictability."

13.     On June 17, 2021, Lightning eMotors' management reiterated its false and misleading statements during "analyst day." The Individual Defendants stated that the Company's "established network" of suppliers and manufacturing partners were "making it easier to scale" and that they were confident in the latest financial projections.

14.     After the close of the markets on August 16, 2021 – only two months after assuring the market that the Company's established network of suppliers were "making it easier to scale" – Lightning eMotors announced that, as a result of "supply chain challenges," it had produced only 37 vehicles and powertrain systems in the second quarter, and had generated first half 2021 revenues of only $10.5 million. As a result, the Company announced a first half 2021 loss of $73.5 million, with a net loss per share for the quarter of $0.79. The Company's gross margin had also declined from -16% in the first quarter of 2021 to -19% in the second quarter.  Consequently, the Company withdrew its prior financial guidance for 2021. The Company also announced that Defendants Miotto, Dinu, and Katz, the GigCapital3 team members elected to the Board, would not seek re-election to the Company's Board, thereby completely abandoning the much touted Mentor-Investor model.

15.     The price of Lightning eMotors' stock dropped from $9.63 per share on August 16, 2021 to a close of $8.00 per share on August 17, 2021, the first trading day after announcement of the Company's second quarter and half year results.

16.     As a result of the foregoing, the Securities Action was filed on December 1, 2021, exposing the Company to massive class-wide liability.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Individual Defendants have conducted business in this District, and the Individual Defendants' actions have had an effect in this District.

## PARTIES

*Plaintiff*

22.     Plaintiff is, and has been at all relevant times, a shareholder of Lightning eMotors.

*Nominal Defendant*

23.     Nominal Defendant Lightning eMotors is a Delaware corporation with its principal executive offices located at 815 14th Street SW, Loveland, CO 80537. Lightning eMotors's

common stock trades on the NYSE under the ticker symbol "ZEV."

*GigCapital3 Defendants*

24.    Defendant Katz is, along with Defendant Dinu, the majority owner of GigCapital3, GigFounders LLC, and GigManagement LLC. Katz was the Chief Executive officer ("CEO"), President, and Secretary of GigCapital3, as well as its Chairman of the Board of Directors. After the Merger closed, Katz served as co-Chairman of the Lightning eMotors Board of Directors (the "Board") until October 7, 2021.

25.    Defendant Dinu, the spouse and business partner of Defendant Katz, served as a member of the GigCapital3 Board of Directors until the Merger closed. Following the Merger, Dinu served on the Lightning eMotors Board until October 7, 2021. Dinu is a founding managing partner of GigCapital Global, a Managing member and majority owner of GigFounders LLC, and a managing member of GigManagement LLC.

26.    Defendant Miotto was a director of GigCapital3 from February 2020 until the Merger closed. Following the Merger, Miotto served as a director of the Lightning eMotors Board until October 7, 2021. Miotto is also a Managing Partner of GigCapital Global, a minority owner of GigFounders LLC and GigManagement LLC.

27.    Defendant Brad Weightman ("Weightman") was the Chief Financial Officer ("CFO") of GigCapital3 from February 2020 until the Merger closed, receiving compensation of $5,000 to $15,000 per month. Prior to the IPO, Weightman was issued 5,000 Insider Shares of GifCapital3.

28.    Defendant John J. Mikulsky ("Mikulsky") was a member of the GigCapital3 Board of Directors from February 2020 until the Merger closed.

29.    Defendant Andrea Betti-Berutto ("Betti-Berutto") was a member of the

GigCapital3 Board of Directors from February 2020 until the Merger closed. Prior to the IPO, Betti-Berutto received 5,000 Insider Shares of GigCapital3.

30.    Defendant Peter Wang ("Wang") was a member of the GigCapital3 board of directors from February 2020 until the Merger closed.

31.    The defendants identified in above in paragraphs 24-30 are collectively referred to herein as the "GigCapital3 Defendants."

***Lightning eMotors Defendants***

32.    Defendant Robert Fenwick-Smith ("Fenwick-Smith") is and has been the Chairman of the Board of the Company since October 7, 2021, having previously served as the Company's Co-Chair of the Board. Fenwick-Smith served as Lightning eMotors interim Chief Financial Officer from February 2020 through December 2020, and is currently the Chair of the Company's Finance and Investment Committee.

33.    Defendant Timothy Reeser ("Reeser"), the founder of Lightning eMotors (then-Lightning Hybrids), is and has been the Chief Executive Officer ("CEO") of the Company since 2012, and a member of the Company's Board since the inception of Lightning Hybrids.

34.    Defendant Bruce Coventry ("Coventry") is and has been a member of the Company's Board since the Merger closed. Coventry is currently the Chair of the Company's Nominating and Corporate Governance Committee and a member of the Compensation Committee. Since the first quarter of 2020, Coventry has served as a senior advisor to GigCapital Global, described as a leading automotive technology and business advisory board.

35.    Defendant Kenneth Jack ("Jack") is and has been a member of the Company's Board since October 2021. Jack is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

36.     Defendant Thaddeus Senko ("Senko") is and has been a member of the Company's Board since the Merger closed, and is currently the Chair of the Audit Committee, and a member of the Finance and Investment Committee.

37.     Defendant Diana Tremblay ("Tremblay") is and has been a member of the Company's Board since the Merger closed and was appointed Lead Independent Director in June 2021. Tremblay currently serves as Chair of the Compensation Committee, and he is a member of the Audit Committee and the Finance and Investment Committee.

38.     Defendant Teresa Covington ("Covington") was Senior Vice President and Chief Financial Officer ("CFO") of the Company from 2021 through October 2022.

39.     The Defendants referenced in paragraphs 32 through 38 are collectively referred to herein as the "Lightning Defendants" and, together with the GigCapital3 Defendants, collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

40.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

41.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

42.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this

Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

46.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Lightning eMotors's own Code of Business Conduct and Ethics;

(b)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the

SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

47.    Each of the Individual Defendants further owed the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

48.    At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

49.    Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

50.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

### LIGHTNING EMOTORS'S CODE OF BUSINESS CONDUCT AND ETHICS

51.    Lightning eMotors's Code of Business Conduct and Ethics provides:

The purpose of this Lightning eMotors Code of Business Conduct and Ethics (the

"Code") is to confirm the commitment of Lightning eMotors, Inc. and its subsidiaries (the "Company") to conduct its and their affairs in accordance with the highest standards of integrity. Just as the Company has a responsibility to conduct its business in strict compliance with all applicable laws and regulations, so too it expects its employees, officers and directors to act in accordance with the highest standards of business ethics both on and off Company premises, and to avoid any appearance of impropriety. The Company greatly depends upon its employees, officers and directors for their adherence to sound business principles, their compliance with applicable laws, rules and regulations, and their dedication to high ethical business standards. With this Code, we, as employees, officers and directors, share in the responsibility of developing and maintaining the honesty and integrity of our Company.

52.     The Code of Business Conduct and Ethics continues:

In that regard, you must:

• comply with applicable laws, rules, and regulations;

• conduct all dealings with the Company's customers, suppliers and competitors fairly, with honesty and integrity;

• ethically handle conflicts of interest, both real and perceived, in personal and professional relationships;

• produce, or cause to be produced, full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission (the "SEC") and in other public communications;

• protect information, in any form, that belongs to the Company, its customers and suppliers;

• protect the Company's assets and ensure their efficient use and report any suspected incident of fraud or theft immediately; and

• never use your position with the Company or Company assets or information for improper personal gain.

53.     Moreover, according to the Code of Business Conduct and Ethics:

The foundation on which this Code of Business Conduct and Ethics is built is obeying the law and acting ethically. It is the Company's policy that you conduct business in accordance with applicable federal, state and local laws, rules and regulations and with the laws, rules and regulations of other countries in which the Company does business. In addition, the Company's policy demands that you

adhere to the highest standard of business ethics and conduct.

You must be alert and sensitive to situations that could result in illegal, unethical, or improper action. . . .

54.      The Code of Business Conduct and Ethics further provides:

As noted in the Ethical Standards set forth above, the Company requires full, fair, accurate, timely and understandable recording and reporting of all Company information. The Company's books, records and accounts must reflect, accurately and fairly, and within the Company's normal system of accounting, all of its transactions. Therefore, you must act in a manner that ensures that all of the Company's books, records, accounts and financial statements are maintained in reasonable detail, appropriately reflect the Company's transactions and conform both to applicable legal requirements and to the Company's system of internal controls.

Good financial reporting starts with good recordkeeping, and the Company and its management rely on its records to prepare financial statements that present its results of operations and financial position in a full, fair, accurate, timely and understandable manner. These financial statements are relied on by stockholders, creditors, governmental authorities, and the public. It is, therefore, critical that all employees involved with recording, summarizing and maintaining business and accounting records do so in accordance with the following:

• All assets, liabilities, revenues and expenses will be recorded in the financial records of the Company and its subsidiaries;

• No undisclosed or unrecorded funds or accounts will be established for any purpose;

• No false or artificial entries will be made for any reason; and

• No payments will be approved or made with the intention or understanding that any part of the payments are to be used for any purpose other than that described by the documentation supporting the payment. . . .

It is very important that you do not create, or participate in the creation, or perpetuation of, any records that are intended to mislead anyone or conceal any improper act or conduct.

Furthermore, if you are in any way involved in preparing the Company's disclosure documents (such as SEC filings or press releases), you must produce full, fair, accurate, timely and understandable disclosure in such documents.

Persons involved in preparing and finalizing the Company's financial information,

whether for internal or external reporting purposes, and disclosure documents should do so in accordance with the following:

• Assist in maintaining internal control over financial reporting.

• Inform the Chief Accounting Officer or the above-named Board Representative or such other individuals responsible for ensuring that appropriate controls and procedures are in place and followed for all quarterly and annual financial filings promptly of business transactions, events or circumstances that could have a material impact on the Company's financial statements.

• Communicate openly and honestly with the Company's external public accountants with respect to quarterly and annual financial reporting and related disclosures.

• Ensure the financial statements and related disclosures include all information deemed necessary to achieve an appropriate degree of transparency of business transactions . . . .

It is the responsibility of all employees, officers and directors to comply with all applicable laws, regulations, governmental policies, the Code and the Company's related policies and procedures.

## SUBSTANTIVE ALLEGATIONS

55.    According to its public filings, Lightning eMotors "is a leading electrification solutions provider" that "design[s] and manufacture[s] zero-emission vehicles ("ZEVs"), including battery electric vehicles ("BEV") and fuel cell electric vehicles ("FCEV"), and charging infrastructure solutions for commercial fleets, large enterprises, original equipment manufacturers ("OEMs") and governments." The Company's products include Class 3-5 cargo and passenger vehicles and school buses to Class 5 and 6 work trucks, and Class 7 city buses and motorcoaches.

56.    GigCapital3, the Company's predecessor, held its IPO on May 18, 2020. GigCapital3 was a Private-to-Public Equity company, also known as a blank check company or SPAC, formed for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization, or similar business combination with one or more businesses.

57.    GigCapital3 attempted to set its SPAC apart by touting its "unique 'Mentor-Investor' philosophy" to partner with its targets to offer "financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company." GigCapital3 further claimed that it would "share best practices and key learnings, gathered from our management team's operating and investing experience, as well as strong relationships in the [technology, media and telecommunications ("TMT")] . . . industry, to help shape corporate strategies" by appointing members of the GigCapital3 management team on the board of the new public target company.

58.    GigCapital3 raised $200 million through the sale of securities to investors in its IPO.  Prior to the IPO, SPAC sponsor GigAcquisitions3 (owned by the GigCapital3 management team) purchased more than 5.7 million "founders' shares" of GigCapital3 (approximately 20% of the SPAC) for just $25,000.

59.    On December 10, 2020, it was announced that GigCapital3 and Lightning Systems (f/k/a Lightning eMotors) had reached an agreement for a business combination pursuant to which Lightning Systems would become a publicly traded company listed on the NYSE. Upon closing of the transaction, Lightning Systems would become a wholly-owned subsidiary of GigCapital3, GigCapital3 would rename itself Lightning eMotors, and GigCapital3 units, warrants, and common stock – then trading on the NYSE under the symbols "GIK.U," "GIK.WS," and "GIK" – would be relisted as "ZEV.WS" and "ZEV," with the units ("GIK.U") first being broken into their underlying securities.

60.    Lightning Systems was portrayed as an ideal business combination candidate for GigCapital3. For example, the December 10, 2020 press release announcing the agreement stated that Lightning Systems was a "leading innovator" in the U.S. commercial electric vehicle market

and a "high-growth electric vehicle manufacturer." Claiming that Lightning Systems was experiencing substantial growth, the press release stated Lightning Systems had production capacity of 1,000 vehicles per year, and it would reach annual production capacity of 20,000 medium-duty commercial electric vehicles by 2025. The press release assured investors that Lightning Systems purportedly had "strong visibility" into its future revenue because "100% of [Lightning Systems'] projected 2021 revenue of $63 million and 25% of 2022 projected revenue of $354 million is under firm purchase orders as of today, and strong line of sight to $2 billion in projected 2025 revenue, including $1 billion from existing fleet customers."

61.    In an investor conference call later that day, Defendant Dinu told investors that "[t]he company has superior technology, the largest manufacturing facility for electric commercial vehicles in the US, excellent leadership, and critically from a market perspective, the best revenue visibility." He further stated that "Lightning enjoys dominant market positioning with a robust backlog of contracts, which will enable the company to quickly scale revenues." Likewise, Defendant Reeser told investors, "[t]hose orders and those customers that we've already earned provide a great deal of insight into our projected revenue of $2 billion for 2025, and provide strong visibility over the next five years and to where that revenue comes from and what it is, with contracted orders that we already have in place today."

62.    On March 26, 2021, the Proxy for the Merger was declared effective. In the Proxy, GigCapital3 stated "[w]e believe that through our Mentor-Investment approach, we will be able to work with Lightning Systems to look for and successfully exploit opportunities for value creation." The Proxy portrayed Lightning Systems as "the dominant market leader in the urban commercial Zero Emission Vehicle ("ZEV") industry, with over 36% market share in Class 3 through 6 electric vehicles ("EVs") in 2020 and has the distinction of being the only company in the United States

18

that has delivered fully functional Class 3 to 7 EVs to the end customer that are in use today." The
Proxy represented that Lightning Systems "had $169 million of backlog, as compared to a backlog
of $27 million as of December 31, 2019, and a pipeline of $800 million of sales." Lightning
Systems claimed to have "already received purchase orders to completely cover our estimated
2021 and over 25% of 2022 revenue."

63.     In foregoing a fairness opinion regarding the proposed Merger, the Proxy stated
that, among other things, GigCapital3 considered that:

- *Lightning Systems' Capital Light and Cost Effective Business Model*. Lightning Systems' relationships with its suppliers are instrumental to the performance and reliability of its vehicles and ***have enabled it to scale in a relatively asset light and cost-effective manner***.

- *Lightning Systems' Competitive Advantages in Cost of Ownership and Fueling Infrastructure*. The commercial ZEV space is at an inflection point with strong secular trends of regulation, corporate mandates and grants to accelerate the transition to zero emission vehicles globally, and as a result provide a lower Total Cost of Ownership ("TCO") than Internal Combustion Engine ("ICE") vehicles. It is expected that by the first half of 2022, the TCO of New Lightning eMotors' vehicles will be lower than ICE without relying on grants and credits, as the company continues to reduce vehicle costs through economies of scale and contract-based cost reductions across the supply chain.

- *Lightning Systems' Competitive Advantages in Vehicle Performance*. Lightning Systems has manufactured and sold vehicles on the road for over two years, providing an important first-mover advantage in the commercial ZEV space across Class 3 to 7 vehicles. While other companies are still in the prototyping phase, it has a broad range of customers who have validated its vehicles. Lightning Systems has been actively gathering telematics data off each vehicle every day and utilizing its analytics capabilities to optimize vehicle performance, which enhances customer attachment, which is expected to result in low churn. As a result, the company has been able to quantifiably demonstrate reliability and TCO validation for its customers, while continuing to improve its manufacturing and design practices. This has led to continued growth in market share.

- *Strong Customer Demand*. The sales cycle can take up to two years, as many customers wish to test and purchase vehicles in small numbers before scaling. Because Lightning Systems has already completed this process with many customers, it is seeing strong repeat purchase behavior from many of its early purchasers. In the third quarter of 2020, it received $120 million in repeat purchase

orders. As of December 31, 2020, Lightning Systems had $169 million of backlog, as compared to a backlog of $27 million as of December 31, 2019, and a pipeline of $800 million of sales. Lightning Systems has already received purchase orders to completely cover its estimated 2021 and over 25% of 2022 revenue. ***As Lightning Systems continues to scale its manufacturing capabilities to meet increased demand – from both new and existing customers – Lightning Systems anticipate that its pipeline will continue to scale***.

- *Available Infrastructure*. At Lightning Systems' 124,000 square foot headquarters, it is capable of designing, manufacturing, assembling and testing its ZEVs, powertrains and charging solutions. It manufactures its powertrains at its headquarters but also trains its original equipment manufacturer partners' technicians to install them at their own manufacturing facilities. Lightning Systems facility's current production capacity is 500 vehicles per shift per year. Lightning Systems is currently expanding its production facility by roughly 107,000 square feet to prepare for capacity expansion to 3,000 vehicles per shift per year needed to meet the unit forecast for 2022.

- *Terms of the Business Combination Agreement*. The financial and other terms of the Business Combination Agreement and the fact that such terms and conditions are reasonable and were the product of arm's length negotiations between the Company and Lightning Systems.

(Emphasis added).

64.     In addition, the Proxy disclosed Lightning Systems' management financial projections through 2025, stating, among other things, that for 2020, Lightning Systems projected $9 million in revenues, with gross margins of 3%; for 2021, projected revenues of $63 million, gross profit of $9 million, and gross margin of 14%; for 2022, projected revenues of $354 million, gross profit of $68 million, and gross margin of 19%; for 2023, projected revenues of $640 million, gross profit of $140 million, and gross margin of 22%; for 2024, projected revenues of $1.165 billion, gross profit of $296 million, and gross margin of 25%; and, for 2025, projected revenues of $2.012 billion, gross profit of $528 million, and gross margin of 26%.

65.     The Proxy also stated that Lightning Systems was identified as GigCapital3 sought "Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an

enterprise value of over $1 billion," and that GigCapital3 "through [their] Mentor-Investment approach, will be able to work with Lightning Systems to look for and successfully exploit opportunities for value creation." The Proxy further stated that the Company's management team would remain involved in the new Lightning eMotors following the Merger, with Katz becoming a Class III director and the co-Chairman of the Lightning eMotors Board with a term of three years; Dinu becoming a Class II director with a term of two years; and Miotto becoming a Class I director with a one-year term.

66.     The Proxy also emphasized the strength of Lightning Systems' supply chain, stating:

> We optimize our supply chain for quality, reliability, and cost. We believe ***our long-term relationships with supply chain partners will be a key driver in our ability to scale without unduly sacrificing quality or delivery times and serve as a foundation for our growth.*** Because we have relationships with multiple suppliers for each core component of our vehicles, ***we are able to build and maintain a high degree of resilience in our supply chain, which will assist us with mitigating delays***. We also partner with battery pack manufacturers allowing us to keep the latest battery technology in our vehicles at the time of manufacturing. To this end, we have recently entered into a three-year contract with our primary battery supplier, Romeo Power Technology, that will secure battery inventory without significant fluctuations in cost. We believe, that through careful supply chain management and the cultivation of long-term relationships with our suppliers, we can reduce our cost-of-goods-sold by up to 50% over the next 18 months. Continuous communication and partnerships with all of our suppliers has enabled us to maintain cutting-edge technology in our vehicles at the lowest possible cost.

(Emphasis added).

67.     In truth, Lightning Systems had to rely on smaller, less established suppliers to provide critical components such as batteries. Supply chain delays, exacerbated by the COVID-19 pandemic, caused significant production delays. According to the Consolidated Complaint filed in the Securities Action (the "Sec. Cplt."), "[s]upply shortages and their impacts on production quotas were frequently discussed at weekly or twice-weekly meetings on the production floor between

Defendant Reeser, Bill Kelley, Director of Supply Chain & Operations, Brandon McNeil, and production floor supervisors." *Id*. at ¶ 82.

68.    In addition, Lightning Systems was plagued with quality issues. According to one former technician, its vehicles had "a failure rate of approximately 40% to 50% and sometimes required repairs just a few days after delivery to end-users." *Id.* at ¶ 83.

69.    The Merger closed on May 6, 2021, and Lightning eMotors securities began trading on the NYSE on May 7, 2021. On May 11, 2021, just five days later, the new Lightning eMotors Board met and elected to reclassify the directorships of Defendant Katz (now co-Chairman of the Board) and Defendant Dinu, so that like Defendant Miotto, they would only serve initial terms of one year on the Board. They would need to run for re-election on October 7, 2021 at the first annual shareholder meeting.

70.    A few days later, on May 17, 2021, Lightning eMotors announced disappointing financial results for the first quarter of 2021, producing only 31 vehicles and one powertrain kit of its projected 500 annual quota and a net loss for the quarter of $27.4 million. It also revised its financial guidance downward, guiding $50 to $60 million in revenue for 2021 rather than the $63 million reported in the Proxy, an approximate 5-20% reduction in revenue. Lightning eMotors management attributed the miss to supply chain "headwinds" in the first quarter, and noted that supply chain shortages would "have a significant impact on short-term margin and operating costs," but still insisted that "Lightning eMotors [was] well-positioned to achieve its 2021 forecast of over 500 purpose-built zero emission commercial vehicles," and well equipped to handle any further "supply chain unpredictability."

71.    Lightning eMotors' management reiterated its confidence in its ability to manage supply chain issues at an analyst day event on June 17, 2021. Company Chief Technology Officer

and Chief Operating Officer ("COO") Bill Kelley ("Kelley") stated that "[t]he other serendipitous value is, because we have numerous supplies that can be applied to the same platforms. When one supplier has a particular issue or a struggle, we're able to use multiple battery configurations on a particular chassis" and "that flexibility allows us . . . some diversification of our supply chain, when times get rough for some of these guys." Sec. Cplt., ¶ 95. Defendant Covington stated that "as Bill talked about on his slide, we have multiple partners across many of the parts that we purchased, which is one of the ways that we have been one managing the cost, as well as managing some of the supply chain disruptions that we've had," and that the mature supply chain would help drive positive gross margin in the fourth quarter of 2021. Covington also reaffirmed that Lightning was "planning to grow our capacity, estimating from 500 units [in 2021] to 3,000 units next year." *Id.*

72.    On June 16, 2021, Defendant Reeser's salary was increased to $500,000 per year, more than double his previous salary, with eligibility for an annual bonus up to $400,000. He was also granted a one time "special transaction bonus" of $300,000 in connection with the closing of the Merger. Defendants Covington and Fenwick-Smith, as well as COO Kelley, were also given "special transaction bonuses" of $50,000 each.

73.    On July 8, 2021, the Company filed a Form 424B3 prospectus with the SEC (the "Prospectus"). The Prospectus stated that Lightning eMotors was poised to take advantage of "a significant total addressable market of approximately $67 billion" and had "built an extensive ecosystem of supply-chain partners and specialty vehicle partners which are instrumental to our growth." The Prospectus reported the Company's production capacity at 500 units per year.  It further claimed that because of its recent expansion, Lightning eMotors had "capacity to manufacture and assemble 3,000 ZEV vehicles and/or powertrain units per year, on a single labor

shift."

74.    After the market closed on August 16, 2021, the truth was revealed. The Company announced that, as a result of "supply chain challenges," it had produced only 37 vehicles and powertrain systems in the second quarter, generating only $10.5 million in revenues during the first half of 2021, with a net loss over the same period of $73.5 million and net loss per share for the quarter of $0.79. The Company's gross margin also declined from -16% in the first quarter of 2021 to -19% in the second quarter.  Moreover, the Company announced that it was withdrawing its prior financial guidance for 2021, as it no longer expected to meet the numbers provided, and announced that none of the GigCapital3 team members elected to the Board – Defendants Katz, Dinu, and Miotto – would be standing for re-election.  In other words, just three months after the Merger closed, and amidst significant operational and financial challenges for Lightning eMotors, the GigCapital3 team completely abandoned the "Mentor-Investor" model and three-to-five-year commitment described in the Proxy.

75.    Following these disclosures, Lightning eMotors' stock price dropped from a close of $9.63 per share on August 16, 2021, to a close of $8.00 per share on August 17, 2021, the first trading day after disclosure of the second quarter and first half year results.

76.    As a result of the foregoing, the Securities Action was filed on December 1, 2021, exposing the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

77.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

78.    Lightning eMotors is named solely as a nominal party in this action.  This is not a

collusive action to confer jurisdiction on this Court that it would otherwise not have.

79.    Plaintiff is a current shareholder of Lightning eMotors and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

80.    A pre-suit demand on the Board of Lightning eMotors is futile and, therefore, excused.  The current Board includes Defendants Fenwick-Smith, Reeser, Coventry, Jack, Senko, and Tremblay, who were Company directors throughout the wrongful conduct alleged herein. Therefore, six of the seven current Company directors participated in the wrongdoing described above.

81.    Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants.  A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.  As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the current directors of Lightning eMotors are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

82.    The Individual Defendants, including Defendants Fenwick-Smith, Reeser, Coventry, Jack, Senko, and Tremblay, either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

83.    Each of the Individual Defendants, including Defendants Fenwick-Smith, Reeser, Coventry, Jack, Senko, and Tremblay, approved and/or permitted the wrongs alleged herein to

have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

84.    Each of the Individual Defendants, including Defendants Fenwick-Smith, Reeser, Coventry, Jack, Senko, and Tremblay, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

85.    Additionally, each of the Individual Defendants, including Defendants Fenwick-Smith, Reeser, Coventry, Jack, Senko, and Tremblay, received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

86.    Accordingly, a pre-suit demand on the Board is futile and excused.

## COUNT I

**Against the GigCapital3 Defendants and Defendants Fenwick-Smith and Reeser for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

87.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

88.    Plaintiff brings this count on behalf of herself as a shareholder eligible to vote on the proposed merger and business combination of GigCapital3 and Lightning Systems.

89.    Plaintiff asserts solely negligence claims in this count, which is brought within the applicable statute of limitations.

90.     The Proxy successfully solicited shareholders to approve the Merger. The Proxy stated that Lightning Systems was positioned to generate $63 million in revenue and 14% in gross profits in 2021, and $354 million in revenues and 19% gross profits in 2022. The Proxy further represented that Lightning Systems' long-term relationships with its supply chain partners enabled the company to scale in a cost effective manner. The Proxy further represented that Lightning Systems' supply chain was "optimized" for quality, reliability, and cost with a high degree of resilience that would mitigate delays. The Proxy represented that Lightning Systems had the capacity manufacture 500 vehicles and/or powertrains per year.

91.     These representations in the Proxy were materially false and misleading, and/or omitted material facts to make the statements not misleading, when issued. Lightning Systems' financial projections were not attainable because it lacked a supply chain adequate to ensure the delivery of components in sufficient quantity or quality to scale Lightning Systems as represented. As alleged above, Lightning Systems' suppliers were smaller vendors who were incapable of providing critical components to meet Lightning Systems' production projections.

92.     Likewise, the representations in the Proxy concerning Lightning Systems as a Mentor-Investor candidate with which GigCapital3 could partner for 3-5 years with a goal of reaching enterprise value exceeding $1 billion were materially false and misleading because the Mentor-Investor approach was completely abandoned in August 2021, six months after the Merger closed.

93.     Finally, the Proxy's representations that the terms of the Merger were "reasonable" and in the best interests of the Company and its shareholders, and recommending that shareholders vote in favor of the Merger, were materially false and misleading.

94.     Plaintiff, who was entitled to vote on the Merger and held her shares through the

close of the Merger, was damaged as a direct and proximate result of the untrue statements of material facts and/or the omission of material facts in the Proxy.

95.    The GigCapital3 Defendants and Defendants Fenwick-Smith and Reeser negligently issued, or caused to be issued, false and misleading statements of material facts, or omitted material facts required to be stated for the statements contained in the vote solicitations to be not misleading, and failed to update the Proxy statements with material information which surfaced after the dissemination of the materially misleading statements, and/or omissions, prior to the shareholder vote on April 21, 2021.

96.    The GigCapital3 Defendants and Defendants Fenwick-Smith and Reeser thereby violated § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

97.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

99.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

100.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the

Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

101.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

102.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against All Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

103.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.    By encouraging and accomplishing the illegal and improper transactions alleged herein, concealing them from the public, and failing to take any action to seek redress from the Individual Defendants that have issued, or caused the issuance of, materially false and misleading statements, the Individual Defendants have each encouraged, facilitated, and advanced the breaches of fiduciary duties. In so doing, the Individual Defendants have each aided and abetted,

conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

105.    Plaintiff on behalf of Lightning eMotors has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lightning eMotors.

108.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Lightning eMotors that was tied to the performance or artificially inflated valuation of Lightning eMotors, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

109.    Plaintiff, as a shareholder and a representative of Lightning eMotors, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

110.    Plaintiff on behalf of Lightning eMotors has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    The wrongful conduct alleged regarding the issuance of false and misleading

statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

113.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Action.

114.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

115.    Plaintiff on behalf Lightning eMotors has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 17, 2023

**SHUMAN, GLENN & STECKER**

By: */s/ Rusty E. Glenn*
600 17th Street, Ste. 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
rusty@shumanlawfirm.com

*Local Counsel for Plaintiff*

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Vincent A. Licata
825 East Gate Blvd., Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

*Counsel for Plaintiff*

DocuSign Envelope ID: B53F4CE4-4056-40CF-94D0-CDDB0372079F

## **VERIFICATION**

I, Kelly Lanham, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _2/22/2023_____

_Kelly Lanham_____
Kelly Lanham

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with this Court on March 17, 2023 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.

/s/    *Rusty E. Glenn*